### MUTUAL RESERVE FUND LIFE ASS'N v. SIMMONS.

(Circuit Court of Appeals, First Circuit. March 8, 1901.)

#### No. 332.

1. LIFE INSURANCE—TERMS OF POLICY— PROVISION THAT IT SHALL NOT TAKE EFFECT UNTIL PAYMENT OF PREMIUM.

A provision of a policy of life insurance clearly stating that, although delivered, it should not take effect until the first premium had been paid, is valid and enforceable, at least to the extent of requiring that the holder should have paid, or obligated himself to pay, the first premium in full before the policy would attach.[1]

2. SAME.

A policy of life insurance contained a provision that possession of it by the insured should not render it valid unless premium thereon had actually been paid in cash. Such policy was issued on an application made through an agent of the company who was allowed by custom to retain his commission from the first premium. The agent delivered the policy to the applicant, and himself remitted to the company the portion of the first premium in excess of his commission, taking a note from the applicant for an amount equal to about two-thirds of the entire premium. The company, in the belief that the premium had been fully paid in cash, credited the same to the policy holder, but, on learning the facts after his death, and while the note was wholly unpaid, at once repudiated the transaction and refused payment of the policy. The evidence showed that it was understood between the agent and the applicant that the note of the latter covered all he should be required to pay on account of the first premium, but the agent had no authority from the company, either express or by virtue of his agency, to accept less than full payment in cash. *Held*, that aside from the question whether, under its terms, the policy would have become effective had the note been for the full amount of the premium, it did not attach in the absence of proof that the holder had either paid, or agreed to pay, in some manner, such premium in full.

In Error to the Circuit Court of the United States for the District of Massachusetts.

Victor J. Loring (Barron C. Moulton and George Burnham, Jr., on the briefs), for plaintiff in error.

James R. Dunbar (John O. Teele, on the briefs), for defendant in error.

Before COLT and PUTNAM, Circuit Judges, and WEBB, District Judge.

---

[1] Commencement of insurance risk, see note to Insurance Co. v. Phillips, 41 C. C. A. 273.

PUTNAM, Circuit Judge. The labor put on the court in examining this case, and its liability to oversight, have been much increased by the disregard of our rule requiring that, on every reference to the record, briefs shall state the page to which the reference is made.

This is a suit on an insurance policy obtained by George W. Simmons on his own life, payable to the plaintiff below. The defendant below is a New York state corporation. The policy is dated on November 13, 1897, and it was issued on an application made at Boston on October 30th, and signed by Simmons. He died on February 22. 1898. The substantial question is whether the policy attached. The verdict and judgment in the court below were for the plaintiff below. At the close of all the evidence the defendant below requested the court to direct a verdict for it, which request was refused, and an exception taken thereto. It is not necessary to consider any other question than whether the court should have granted this request.

The negotiations were made through Homer E. White, an agent at Boston of the defendant corporation. There is nothing in the case showing that the corporation had such relations, either to the state of Massachusetts or to White as its agent, as to give White any peculiar powers beyond those which it specifically conferred on him. In this respect the case is unlike Insurance Co. v. Chamberlain, 132 U. S. 304, 10 Sup. Ct. 87, 33 L. Ed. 341. The only authority conferred on White is found in the written agreement with him which makes a part of the record. All the connection which he properly had with the transaction, so far as the defendant corporation was concerned, was to obtain the application and forward it, receive back the policy, deliver it to George W. Simmons, and take payment of the first premium, and, on payment being made, to deliver Simmons the proper receipt for the same.

The policy was thus delivered to Simmons soon after November 12, 1897, on which date it was mailed by the defendant corporation to White. Simmons never obtained a receipt for the payment of any premium, and never, in fact, paid any money for the policy, nor anything except the promissory note to which we will refer later. The application contained, among other things, the following:

"Under no circumstances shall the insurance hereby applied for be in force until payment in cash of the first premium, while the applicant is in good health, and delivery of the policy to the applicant in person, during his lifetime and while in good health."

The policy contains on its face a notice in striking type that possession of it by the insured does not render it valid "unless premium thereon has actually been paid in cash." This throws light on all questions of fair dealing and good faith. The policy does not acknowledge the receipt of any premium, and it refers to the application as a consideration for its issue. The face of the policy makes it subject to the provisions stated on its second page, among which are the following:

"This contract shall not take effect until this policy is delivered to the member in person, during his lifetime and while in good health, nor until the first premium is paid in cash hereon while said member is also in good health. No contract, alteration, or discharge of contracts, waiver of forfeitures, nor

granting of permits or credits, shall be valid unless the same shall be in writing, signed by the president or vice president and one other officer of the association."

"Each premium is due and payable at the home office of the association in the city of New York, but may be accepted elsewhere by a duly-authorized local treasurer in exchange for the association's official receipt signed by its president, secretary, or treasurer; and no premium on this policy shall be considered as paid unless such a receipt shall be given therefor, which receipt is the sole evidence of the authority of any person to receive any premium on account of this policy."

The evident expectation of the corporation was that delivery of the policy did not complete the contract, and that the payment of the first premium in cash was necessary for its completion. No presumption of payment of the premium arose from the delivery of the policy to Simmons. Indeed, at the close of the judge's charge, the plaintiff below stated that she did not claim that the possession of the policy was any evidence of such payment.

The full effect of the stipulation on the second page of the policy, that no premium shall be considered as paid to an agent unless a special receipt shall be given therefor, need not be determined for the present case. It might be regarded as an extreme proposition to hold that in all aspects there could be an effective stipulation that payment should be proved only in a particular way; but all we need now say is that it may not be such to hold that an insurance corporation is justified in insisting that an applicant for insurance shall come to an understanding with it that, when dealing through an agent, there shall be no opportunity for disputes to arise, as they do in the case at bar, whether a policy has become effective.

By the terms of White's employment, he was entitled to retain for his own compensation 65 per cent. of the first premium, the premium amounting to $436.50. It is shown that it was the practice of this corporation to permit agents to retain the 65 per cent., remitting it only the 35 per cent. which was ultimately due it, with a report that the whole premium had been received. There is, however, no evidence that the corporation ever assented to its agent, White, or to any other agent, receiving payment of any portion of any premium except in cash, or a part of a premium in lieu of the whole, and there is no evidence that there was any practice or custom accordingly. White delivered the policy to George W. Simmons, and remitted 35 per cent. of the first premium in cash in two installments,—the first, $84.82, and the second, $67.95. Thereupon the corporation, on February 2, 1898, forwarded White the receipt referred to in the conditions of the policy which we have cited; but, as we have already said, the receipt was never delivered to Simmons. It also appears that on the 2d day of February, having received its 35 per cent., the corporation credited the premium on its books as fully paid, to wit, in the sum of $436.50, and charged White with the 65 per cent., the portion coming to him. There is no evidence that, at the time these entries were made, the corporation knew, or had any information, that White had not received cash payment of the whole premium, as stipulated in the conditions of the policy. Therefore this transaction did not amount to waiver or estoppel so far as the corporation is concerned.

Immediately after the death of George W. Simmons the defendant corporation learned the facts with reference to the nonpayment of the premium by him in cash, and canceled the transaction so far as it could cancel it. This is of no consequence, except that it relieves it from the presumption which would have arisen against it if it had remained quiescent after being informed of what had occurred.

The plaintiff below had sufficient evidence to go to the jury on a claim that George W. Simmons had arranged with White to advance the corporation on his (Simmons') account, in cash, the 35 per cent. which would ultimately come to it. Under ordinary circumstances, and aside from the peculiar stipulations of the policy in suit, this remittance by White, in connection with an arrangement between him and George W. Simmons as to the balance, if one had been made, might have satisfied the first premium.

There was put in evidence by the plaintiff below a letter from George W. Simmons to White, dated on January 24, 1898. This was produced by White on his cross-examination. It is not questioned that Simmons' understanding of the arrangement as stated in the letter was never repudiated by White. Therefore, the letter became a part of the res gestæ. It enclosed a note from Simmons to White for $296.20, which it said covered $228.25, and also $67.95, erroneously printed "$69.95," which latter it stated had been paid by White for Simmons in cash. This, we have said, was the last installment remitted by White. His cross-examination by the plaintiff below assumed that there was an agreement between him and Simmons for a fraud on the corporation in the matter of the first premium. It computed the note as follows: It took one-half of the premium,—that is to say, $218.25,—added to it $5 for the doctor's certificate and $5 for the policy, making $228.25, and to this added $67.95, leaving $296.20, the precise sum of the note. Simmons and White had understood that the corporation had this sum of $67.95 to the credit of Simmons, which, with White's first remittance of $84.82, would have completed the 35 per cent. coming ultimately to it. This proved to be erroneous, and therefore this $67.95 was remitted to the corporation by White on the precise day on which Simmons' letter bears date. The $84.82 must have been a part of the $218.25 which went to make up the note, leaving White only $133.43 for his commission, and half of the first premium unprovided for except to the extent of the $67.95. Prior to the discovery that the $67.95 was not to the credit of Simmons with the corporation, it was undoubtedly his intention to give a note for only $228.25, and his including the $67.95 was apparently an afterthought, arising from the fact that the amount was not to his credit, as had been supposed. However this may have been, he wrote as follows:

"This note for $296.20 includes the $228.25 and $67.95 which you say you paid for me in cash, as it is not convenient for me to make payment at present in any other way, and I had not understood it was to be paid in any other way. Would like a receipt showing the transaction in detail from the office, as I have nothing on paper at present to show the exact adjustment."

There is much in White's testimony of a general character to the effect that Simmons agreed to pay the full premium, but the cross-

examination to which we have referred, and the terms of this letter, show that this note was intended by Simmons to be the final adjustment between him and White; and White's retention of the letter, without repudiation, leaves him as assenting to the position taken by Simmons. Indeed, these facts are so persuasive as to leave no reasonable ground for maintaining that Simmons intended to pay, much less ever did pay, either directly to the corporation or indirectly through White, anything more than this sum of $296.20 for the first premium called for by the policy. Therefore, not only is there no evidence that Simmons ever paid any part of the premium in cash, as called for by the letter of the policy, but this note is the only payment in any form made by him, or intended to be made by him, on a fair construction of the record.

If the delivery of the policy had afforded prima facie evidence of the payment of the premium, or if George W. Simmons, at his death, had been in possession of the special receipt to which the defendant corporation has given so much importance, the record would, of course, have shown sufficient to have thrown on the defendant below the burden of proving that the policy never attached for want of such payment. But, as we have said, as the record stands, there is no evidence that the defendant corporation ever waived the conditions that the premium should be paid in cash, and that the policy should not become operative until a receipt in the form provided by the policy had authenticated the payment; and much more is there none that it ever waived the payment of the entire premium to somebody. In Insurance Co. v. Unsell, 144 U. S. 439, 449, 12 Sup. Ct. 671, 36 L. Ed. 496, the court reaffirmed its well-settled rule that any agreement, declaration, or course of action on the part of an insurance company, which leads the party insured honestly to believe that by conforming thereto a forfeiture of his policy would not be incurred, followed by due conformity on his part, estops the company from insisting on a forfeiture; but in the present case, as we have seen, what was proved went only to the extent of relieving the agent from remitting the portion of the premium which ultimately belonged to him. There was no waiver or estoppel beyond that.

The receipt, as we have said, lay, at the time of Simmons' death, in the hands of the agent White. White left the transaction in its incomplete state in order, presumably, to secure the ultimate payment of what he had advanced to the corporation, thus holding the case in that doubtful condition in which, as we have said, the defendant corporation might fairly insist that the delivery of the receipt was a prerequisite to the completion of the contract.

In Carpenter v. Insurance Co., 16 Pet. 495, 511, 512, 10 L. Ed. 1044, the supreme court not only held that questions of the character involved here are not determined by local decisions, but also gave complete effect to stipulations in insurance policies prohibiting their modification except in the precise manner which the stipulations provide. Klein v. Insurance Co., 104 U. S. 88, 91, 26 L. Ed. 662, lays down the rule which the supreme court has always maintained,—that with reference to life policies the insurers are entitled to insist on prompt payment of premiums, and that the court will not

relieve from forfeiture for nonpayment,—though this, of course, does not impugn its various decisions where it found that the insurer, by its course of conduct, had waived prompt payment or had induced the insured to understand that it was waived. Hoffman v. Insurance Co., 92 U. S. 161, 23 L. Ed. 539, is, in some substantial aspects, like the case at bar. The opinion, at page 164, 92 U. S., and page 541, 23 L. Ed., said:

"Life insurance is a cash business. Its disbursements are all in money, and its receipts must necessarily be in the same medium. This is the universal usage and rule of all such companies."

In that case the agent who negotiated the policy received the premium in various items, none of which were cash, and gave a receipt for it, in that way putting himself between the insured and the insurance company. But the court said, at page 165, 92 U. S., and page 541, 23 L. Ed., that the exercise of such a power by the agent was liable to two objections,—that it was ultra vires and that it was a fraud as respects the company. The opinion contained other lines of reasoning, growing out of the fact that the agent received a horse in part payment; but the references we have made apply directly to the case at bar.

Nothing would be gained by undertaking to follow through and sift out the decisions of the state tribunals with reference to the questions here involved. How conflicting, and, indeed, how absolutely irreconcilable, they are, will be at once apparent on examining the citations made in May, Ins. (4th Ed. 1900) §§ 137, 137A, 345–345H, and 360–360G, including the notes thereto. It is of advantage, however, to refer especially to the following decisions:

Brown v. Insurance Co., 59 N. H. 298, and Dunham v. Morse, 158 Mass. 132, 32 N. E. 1116, cover cases each of which is substantially like that at bar. If either of those decisions had come from the supreme court, instead of from state tribunals, it would have been broadly in favor of the defendant corporation. So, in Conway v. Insurance Co., 140 N. Y. 79, 35 N. E. 420, decided in 1893 in the state which was the locus of the alleged contract in suit, the insured had given his note to the agent for the premium, but did not pay it during his lifetime, although it had become due. The agent meanwhile retained the renewal receipt. In all substantial respects, except the fact that the present policy required that payment should be made in cash, the case was like the one at bar. The court held that there could be no recovery on the policy.

In addition to the above, we may well refer to chapter 522, § 68, of the Acts of Massachusetts of 1894, as follows:

"No life insurance company doing business in Massachusetts shall make or permit any distinction or discrimination in favor of individuals between insurants of the same class and equal expectation of life in the amount or payment of premiums or rates charged for policies of life or endowment insurance, or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of the contracts it makes; nor shall any such company or any agent thereof make any contract of insurance, or agreement as to such contract, other than is plainly expressed in the policy issued thereon; nor shall any such company or agent pay or allow, or offer to pay or allow, as inducement to insurance, any rebate of premium payable on the policy, or any special favor or advantage in the dividends or other benefit to accrue

thereon, or any valuable consideration or inducement whatever not specified in the policy contract of insurance."

Section 98 subjects violations of section 68 to criminal penalties.

This statute may not apply directly to this policy, because it was made in New York; but section 82 would apply to this corporation in such way as to shut it out from the transaction of business in Massachusetts, if shown to have persistently violated the act. For it to permit its agents to do in that state what, in any view, the agent in this case undertook to do, would be a clear violation; and therefore, in addition to its legal right to insist on stipulations plainly made between it and the insured, the statute illustrates that the courts ought to aid it in so doing, and that the provisions in its policy on which it relies are not unreasonable, but are necessary for its protection. Aside from any statutory regulations, a life insurance corporation has a direct interest in maintaining the solvency of its agents, through whom large sums are often transmitted to or from it. It has, therefore, a direct interest in prohibiting them from involving themselves by incautious credits for amounts for which they (the agents) are holden responsible in cash, and from loading themselves with unavailable assets with reference to any sums for which they must account.

We have expressed our present impressions as to various questions which the parties seem to regard as involved in the case, and which might arise again on a new trial; but inasmuch as their application might be modified, more or less, on a new state of facts which a new trial might bring before us, and as it is not now necessary to decide whether, on the peculiar terms of this policy, a credit given by the agent to an applicant for insurance of the amount of the agent's portion of the first premium, and corresponding entries on the books of the insurer, made in ignorance of the credit, would cause the policy to attach, we have concluded that it is safer to rest our present determination on the simple fact that, whatever was the arrangement between George W. Simmons and White, the record fails to show that anybody ever paid, or agreed to pay, the entire premium called for by the policy, either in cash or otherwise; so that, independently of any question whether the provision cited, requiring payment in cash, would reach the 65 per cent. to be retained by White, and independently of all propositions relating to the special receipt prescribed on payment to an agent, the policy never attached.

The judgment of the circuit court is reversed, the verdict is set aside, the case is remanded to that court for further proceedings in accordance with law, and the plaintiff in error recovers its costs in this court.